AO 106 (Rev. 04/10) Application for a Search Warrant

| | FILED | LODGED |
|---|---|---|
| | RECEIVED | |

# UNITED STATES DISTRICT COURT
## for the
### Western District of Washington

AUG 27 2018

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY _____ DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

19630 Ash Crest Loop NE, Apartment 36, Poulsbo,
Washington 98370, more particularly described in
Attachment A

)
)
)
)
)
)

Case No.  MJ 18 - 5 200

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, attached hereto and incorporated by reference herein.

located in the _____ Western _____ District of _____ Washington _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, attached hereto and incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a), 846 | conspiracy to distribute controlled substances, distribution, and possession with intent to distribute controlled substances |

The application is based on these facts:

See Affidavit of DEA Special Agent Steven Meyer, attached hereto and incorporated by reference herein.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Steven Meyer, Speical Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/27/2018

_____
*Judge's signature*

City and state: Tacoma, Washington

David W. Christel, United States Magistrate Judge
*Printed name and title*

USAO 2018R00760

**AFFIDAVIT**

STATE OF WASHINGTON )
                     )   ss
COUNTY OF PIERCE     )

Steven Meyer, being first duly sworn on oath, deposes and says:

## AFFIANT BACKGROUND AND EXPERIENCE

1.      I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.      I am a Special Agent with the Drug Enforcement Administration (DEA), and have been since March 2017. I am currently assigned to the Seattle Field Division, Tacoma Resident Office. Prior to my employment with the DEA, I worked as a Uniformed Officer with the Secret Service in Washington D.C., from June 2006 to April 2009. I received formal training at the DEA Basic Agent Training in Quantico, Virginia. The four-month Basic Academy included comprehensive, formalized instruction in, among other things: basic narcotic investigations, drug identification and detection, familiarization with United States narcotics laws, financial investigations and money laundering, identification and seizure of drug-related assets, organized crime investigations, physical and electronic surveillance, and undercover operations.

3.      During the course of my law enforcement career, I have been involved in investigations of numerous criminal offenses, including the offenses involved in this current investigation. I have participated in criminal investigations of illicit drug trafficking organizations, ranging from street-level dealers to major dealers, to include Mexico-based drug trafficking organizations. These investigations have also included the unlawful importation, possession with intent to distribute, and distribution of controlled substances; the related laundering of monetary instruments; the conducting of monetary

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    transactions involving the proceeds of specified unlawful activities; and conspiracies
2    associated with criminal narcotics offenses.  These investigations have included use of
3    the following investigative techniques: confidential informants; undercover agents;
4    analysis of pen register, trap and trace, and toll records; physical and electronic
5    surveillance; wiretaps; and the execution of search warrants.  I have had the opportunity
6    to monitor, listen to, review transcripts and line sheets (prepared by linguists)
7    documenting the content of intercepted conversations involving the trafficking of
8    cocaine, heroin, methamphetamine, and other narcotics, by persons who used some form
9    of code to thwart law enforcement.  I have also interviewed defendants at the time of
10   their arrests and have debriefed, spoken with, or interviewed numerous drug dealers or
11   confidential sources (informants) at proffer interviews who were experienced in speaking
12   in coded conversations over the telephone.  I have gained knowledge regarding the
13   various methods, techniques, codes, and/or jargon used by drug traffickers in the course
14   of their criminal activities, including their use of cellular telephones and other electronic
15   devices to facilitate communications while avoiding law enforcement scrutiny.
16         4.     I have participated in the investigation described herein since April 2018.  I
17   have obtained the facts set forth in this Affidavit through personal participation in the
18   investigation described below, from the review of consensually recorded calls to date,
19   from oral and written reports of other law enforcement officers, from records, documents
20   and other evidence obtained during this investigation, and from confidential sources who
21   are associated with, and have knowledge about the subjects of this investigation and their
22   confederates.  I have obtained and read official reports prepared by various law
23   enforcement officers in other related investigations by other agencies.  Since I am
24   submitting this Affidavit for the limited purpose of obtaining authorization to search the
25   cellular phones described herein, I have not included every fact known concerning this
26   investigation.  I have set forth only the facts that I believe are essential to establish the
27   necessary foundation for the issuance of such warrants.
28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

## PURPOSE OF AFFIDAVIT

5.     This Affidavit is submitted in support of an application to search the following location, as further described in Attachment A, for evidence, fruits and instrumentalities of drug trafficking, firearms, and money laundering crimes committed by Jackson Freeman SUTER, in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, and 952, and Title 18, United States Code, Sections 922(g)(1), 1956, and 1957, as further described in Attachment B.  The location that agents are requesting authorization to search is identified in bold font throughout this Affidavit and is the primary residence of Jackson Freeman SUTER, **19630 Ash Crest Loop NE, Apartment 36, Poulsbo, Washington 98370**.

## CONFIDENTIAL SOURCES

6.     Confidential Source 1 (CS1) is cooperating with the DEA and the West Sound Narcotics Enforcement Team (WestNET) to investigate Jackson SUTER's cocaine distribution organization, as explained in more detail below.  CS1 has no felony convictions, and has one gross misdemeanor conviction for Assault in 2014.  CS1 is working with the DEA and WestNET in exchange for financial consideration.  CS1 has assisted members of WestNET in previous investigations and WestNET found his/her information to be consistently truthful and reliable during those investigations.

## SUMMARY OF PROBABLE CAUSE

7.     Over the course of approximately the past five months, DEA agents and WestNET detectives have been investigating Jackson SUTER's cocaine distribution organization.  SUTER and his associates are known to distribute cocaine at bars and nightclubs in/around Poulsbo and Bremerton, Washington.  Based on information gathered through my and other law enforcement officers' interviews, we believe that SUTER can acquire kilogram-quantities of cocaine, and keeps large amounts of cash on hand.  CS1 informed investigators that SUTER uses multiple distributors in the operation, to include Michael LENTZ and Alex BULLARD.

AFFIDAVIT OF SA Steve Meyer - 3

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  ***Controlled Purchase #1***

2    8.    On April 16, 2018, agents arranged a controlled purchase of cocaine from

3  SUTER, utilizing CS1.  While in the presence of agents, CS1 spoke to SUTER to confirm

4  the time and location of the deal.  During the conversation, SUTER informed CS1 that

5  Michael LENTZ would complete the deal, and it would take place at the Central Market

6  at 20148 10th Avenue NE, Poulsbo, Washington.  CS1 met with LENTZ at the Central

7  Market and successfully purchased the cocaine.  Investigators searched CS1 and his/her

8  vehicle before and after the purchase, and found no contraband items. Special Agent

9  Jeremy Tan field-tested the drugs, as witnessed by me, and they tested positive for

10  cocaine.

11    9.    Surveillance units confirmed that, prior to the deal, LENTZ traveled from

12  his residence at 21117 Norby Drive, Poulsbo, Washington, to SUTER's house at 21482

13  Big Valley Road, Poulsbo, Washington, then to the Central Market.  Following the deal,

14  LENTZ drove directly back to SUTER's residence.

15  ***Controlled Purchase #2***

16    10.    On May 3, 2018, agents arranged a controlled purchase of 2 ounces of

17  cocaine from SUTER for $2,800, again utilizing CS1.  While in the presence of agents,

18  CS1 confirmed with SUTER the time and location of the deal, which again would be the

19  Central Market.  CS1 met with SUTER at the Central Market, and successfully purchased

20  the cocaine. Special Agent Tan field-tested the drugs, as witnessed by me, and they tested

21  positive for cocaine. Investigators searched CS1 and his/her vehicle before and after the

22  purchase, and found no contraband items.  During the post-buy debrief of CS1, he/she

23  informed agents that SUTER was no longer living at 21482 Big Valley Road, Poulsbo,

24  Washington, and was now at the **Hillsider 50 Apartment Complex, sharing Apartment**

25  **36** with Ben McMULLEN.

26

27

28

AFFIDAVIT OF SA Steve Meyer - 4

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

*Identification of SUTER's Supplier*

11.     On June 14, 2018, agents attempted to conduct another controlled purchase from SUTER, for 2 ounces of cocaine, utilizing CS1.  However, prior to the deal, SUTER contacted CS1 and asked if he/she could drive him (SUTER) to Tacoma in order to resupply.  Agents directed CS1 to accept SUTER's offer and drive him to meet the supplier.  At approximately 8:25 p.m., SUTER confirmed he was ready to go, and told CS1 to come and pick him up at **19630 Ash Crest Loop NE, Apartment 36, Poulsbo, Washington 98370**.  Prior to CS1's departure, agents searched CS1 and his/her vehicle for contraband, with nothing found.

12.     At approximately 8:30 p.m., surveillance units observed SUTER leave his apartment, with a zipped up backpack, and enter CS1's vehicle.  Surveillance units followed CS1, with SUTER, from the apartment to the Emerald Queen Casino at 2024 East 29th Street, Tacoma, Washington, and then to the Walmart at 20307 Mountain Highway East, Spanaway, Washington.  SUTER informed CS1 that the supplier had changed the location to Walmart to save time.  SUTER described the supplier as being older, likely parked in a handicapped space at the Walmart.

13.     At approximately 10:20 p.m., agents observed SUTER exit CS1's vehicle, with the zipped up backpack, and walk towards the Walmart.  DEA Task Force Officer (TFO) Eric Jansen observed SUTER approach a large Polynesian-looking individual and begin to speak with him.  Resident Agent in Charge (RAC) Ian McKenzie, on foot at the Walmart, described the individual as having a full beard, two tattoos on his neck, and using an electric wheel chair.  SUTER and the unidentified Polynesian male moved to a gray Dodge Charger (TV1), bearing Washington license AXM0809, parked in a handicapped parking spot.  The Washington Department of Licensing (DOL) indicates the registered owner of the vehicle is Jonathan MOANALE at 20112 14th Avenue Court East, Spanaway, Washington.  RAC McKenzie confirmed the DOL photo of MOANALE matched the individual who met with SUTER.  RAC McKenzie observed SUTER walk back to CS1's vehicle with the backpack unzipped.

14.     SUTER informed CS1 that he had made the money drop, but that the supplier (MOANALE) did not have the cocaine.  However, he (MOANALE) had promised to deliver it to SUTER the next day, June 15, 2018.  CS1 and SUTER agreed to complete their deal for the 2 ounces of cocaine after SUTER had been resupplied.

15.     At approximately 10:45 p.m., TFO Jansen observed TV1 parked at 20112 14th Avenue Court East, Spanaway, Washington.

16.     On June 15, 2018, at around 8:30 p.m., CS1 contacted agents to say SUTER was ready to do the deal.  He/she believed SUTER had met the supplier (MOANALE) sometime in the late afternoon or early evening.

*Controlled Purchase #3*

17.     On June 19, 2018, agents directed CS1 to contact SUTER and make the controlled purchase originally planned for June 14, 2018.  While in the presence of agents, CS1 confirmed the deal would take place at the **Hillsider 50 Apartment Complex, Apartment 36**, at approximately 8:00 p.m.  Agents provided CS1 with $2,800 in buy money to purchase the drugs.  CS1 met with SUTER at the apartment, and successfully purchased one ounce of cocaine for $1,300. Special Agent Tan field-tested the drugs, as witnessed by me, and they tested positive for cocaine.  Investigators searched CS1 and his/her vehicle before and after the purchase, and found no contraband items.  During the debriefing of CS1 after the controlled purchase, he/she informed agents that SUTER was not happy with the quality of the cocaine, and only wanted to sell one ounce.

*SUTER Resupply #1*

18.     On June 26, 2018, SUTER asked CS1 to drive him to resupply in Tacoma, Washington.  CS1 told agents SUTER was expecting to pick up 9 ounces of cocaine. Additionally, SUTER said he would introduce CS1 to his supplier, and they could discuss the possibility of acquiring fentanyl (China White).  Agents directed CS1 to call SUTER and confirm he/she would be available to go.  At approximately 6:05 p.m., SUTER informed CS1 he was ready, and told him/her to come and pick him (SUTER) up at

1   **19630 Ash Crest Loop NE, Apartment 36, Poulsbo, Washington 98370**.  Prior to

2   CS1's departure, agents searched CS1 and his/her vehicle for contraband, with nothing

3   found.

4          19.    At approximately 6:15 p.m., surveillance units observed SUTER leave his

5   apartment, with a white backpack, and enter CS1's vehicle.  They followed CS1, with

6   SUTER, from the apartment to the Emerald Queen Casino at 2024 East 29th Street,

7   Tacoma, Washington, and then to a residence at 4668 Court Q, Tacoma, Washington.

8   Agents observed SUTER and CS1 meet MOANALE on the porch, and sit down.

9   According to CS1, SUTER started the conversation by telling MOANALE that he

10  (SUTER) only had $9,500 of the $10,000, and would have to pay him the rest in a few

11  days.  CS1 has stated that SUTER always brings at least $10,000 with him when

12  resupplying, depending on the amount he (SUTER) is buying.  SUTER also introduced

13  CS1.  MOANALE and CS1 discussed the possibility of buying fentanyl ("China White"),

14  agreeing on a price of $2,500 per ounce.  MOANALE explained that he did not have the

15  fentanyl on hand, and would have to get it.  CS1 asked if it would be possible within the

16  week, and MOANALE confirmed it would, but said CS1 would have to go through

17  SUTER.  The meeting concluded, and MOANALE informed SUTER he would have to

18  come back later to pick up the cocaine.

19         20.    At approximately 10:00 p.m., agents observed CS1's vehicle return to 4668

20  Court Q, Tacoma, Washington.  CS1 and SUTER exited the vehicle, walked to the porch

21  area, and made small talk with MOANALE.  Shortly thereafter, a silver 2007 Chrysler

22  Aspen, bearing Washington license BJE9723 (TV2), arrived at the residence with two

23  unidentified male occupants.  Washington DOL records indicate the registered owner of

24  the vehicle is Yonn Chang at 752 South 88th Street, Tacoma, Washington.  Agents

25  conducted a search of any additional individuals connected to the 752 South 88th Street

26  address in the Washington DOL database, and identified three names:  Leon Som KHA,

27  Vuthy UNG, and Ma Bun YOU.  After later showing DOL photos of KHA, UNG, and

28

1  YOU to CS1, he/she confirmed that KHA and UNG were the two males that arrived in

2  TV2.

3       21.    At approximately 10:10 p.m., agents observed KHA, UNG, SUTER, and

4  CS1 leave, while MOANALE stayed at the residence.  KHA, UNG, and SUTER got into

5  TV2, while CS1 drove his/her vehicle.  Surveillance teams followed both vehicles north

6  to the Doubletree Hilton Hotel Seattle Airport at 18740 International Boulevard, Seattle,

7  Washington.  TV2 stopped next to a new Durango-style vehicle with two unidentified

8  occupants inside.  The passenger, an unidentified black male, exited and moved to TV2's

9  passenger window.  Moments later, the unidentified black male walked back to his

10  vehicle and got in.  All three vehicles exited the hotel, but split up a short time later.  TV2

11  and CS1's vehicle went west on 188th Street, while the Durango-style vehicle went east.

12       22.    At approximately 11:40 p.m., agents observed TV2 and CS1's vehicle pull

13  into the Westwood Village at 2600 Southwest Barton Street, Seattle, Washington.  The

14  vehicles moved alongside a blue 2014 Nissan Altima, bearing Washington license

15  AXE5187, and parked.  Surveillance units observed an unidentified Hispanic male in the

16  passenger seat of the Altima exit the vehicle, walk to the backseat of TV2, walk back to

17  the Altima, then back to TV2's backseat, before returning to the Altima.  Shortly

18  thereafter, the Altima, TV2, and CS1's vehicle departed the location.  Later that evening,

19  CS1 told agents that SUTER had successfully acquired 9 ounces of cocaine.  Agents

20  believe SUTER acquired the drugs from the unidentified Hispanic male in the Altima.

21  ***Surveillance of SUTER Resupply #2***

22       23.    On July 10, 2018, surveillance units observed SUTER resupply in Seattle,

23  Washington with his supplier (MOANALE).  At approximately 5:45 p.m., WestNET

24  detective Cory Manchester observed SUTER leave his apartment at **19630 Ash Crest**

25  **Loop NE, Apartment 36, Poulsbo, Washington 98370**, enter a 2004 BMW, bearing

26  Arizona license BVV2990, and depart the area.  Surveillance units followed SUTER to

27  4668 Court Q, Tacoma, Washington, where he parked in front of the residence.

28

24.     At approximately 6:50 p.m., WestNET detective Jason Bowman observed TV2 arrive at 4668 Court Q.  MOANALE, with an unidentified Polynesian female, exited the vehicle and walked into the residence.  Shortly thereafter, SUTER exited the BMW, with a white backpack, and walked into the residence.  Both SUTER and MOANALE came outside and sat on the porch after a few minutes.

25.     At approximately 7:30 p.m., Detective Bowman observed a 2002 bronze Cadillac arrive at 4668 Court Q.  MOANALE walked to the vehicle and got in. Simultaneously, SUTER moved to the BMW and got in.  Surveillance units observed both vehicles leave the residence and drive to the Mount Baker Rowing and Sailing Center at 3800 Lake Washington Boulevard, Seattle, Washington.

26.     At approximately 8:40 p.m., I observed MOANALE, Leon KHA, and Ma Bun YOU exit the Cadillac, walk to a 2018 Mercedes, and interact with an unidentified black male.  Shortly thereafter, MOANALE walked to SUTER's vehicle and got into the front passenger seat.  They sat inside SUTER's vehicle for approximately five minutes, and then got out.  Agents believe MOANALE supplied SUTER with cocaine during that meeting.  At approximately 9:00 p.m., SUTER got back into the BMW and departed the area.  MOANALE, KHA, and YOU left approximately ten minutes later.

***Overdoses at SUTER's Residence, 9630 Ash Crest Loop NE, Apartment 36, Poulsbo, Washington 98370***

27.     On August 17, 2018, at approximately 11:39 a.m., first responders received an emergency 9-1-1 call from SUTER, who stated that an unidentified female was unresponsive in his apartment at **19630 Ash Crest Loop NE, Apartment 36, Poulsbo, Washington 98370**.  Paramedics responded to the scene and discovered the female dead, with three others in the apartment unconscious.  Paramedics administered Naloxone to the surviving victims, and transported them to the hospital.

28.     At approximately 12:20 p.m., Poulsbo Police Department detectives arrived at **19630 Ash Crest Loop NE, Apartment 36, Poulsbo**, and spoke with SUTER, who was not advised of his *Miranda* rights.  SUTER admitted to removing items from the

AFFIDAVIT OF SA Steve Meyer - 9

1  apartment prior to calling authorities, which he put in a backpack in his BMW's trunk.

2  Detectives read a consent to search card to SUTER for the BMW, and he agreed, but only

3  for a search of the trunk.  The subsequent search resulted in the seizure of a white

4  backpack containing, among other items, a square-shaped dinner plate.  The dinner plate

5  later tested positive for methamphetamine, cocaine, and fentanyl.  Detectives took

6  SUTER to the Poulsbo police station for additional questioning.  Prior to the interview,

7  Poulsbo detective Lee Wheeler read *Miranda* rights to SUTER, who acknowledged his

8  rights and continued talking.  Additionally, detectives seized SUTER's cell phone and

9  entered it into evidence.

10       29.    The next day, August 18, 2018, at approximately 1:00 a.m., Poulsbo and

11  WestNET detectives, with the assistance of Washington's National Guard Civil Support

12  Team (CST), executed state search warrants on SUTER's apartment (**19630 Ash Crest**

13  **Loop NE, Apartment 36, Poulsbo, Washington 98370**) and vehicle.  Detectives seized

14  three cell phones from the apartment, and entered them into evidence.  Additionally, CST

15  technicians performed testing on the handle of a security safe in SUTER's room; the test

16  results came back positive for fentanyl.  The search of SUTER's vehicle resulted in the

17  seizure of suspected cocaine and a small portable scale.

18       30.    On August 22, 2018, at approximately 1:30 p.m., Poulsbo detectives

19  executed an additional state search warrant at SUTER's apartment, **19630 Ash Crest**

20  **Loop NE, Apartment 36, Poulsbo, Washington 98370**.  They seized two additional cell

21  phones, took photos of indicia for SUTER and the overdose victims, and entered them

22  into evidence.

23       31.    Agents are seeking this warrant to enter SUTER's apartment, in part, to

24  acquire any identifiable fingerprints from the security safe that tested positive for

25  fentanyl.  Although Poulsbo and WestNET detectives have executed two prior warrants

26  at **9630 Ash Crest Loop NE, Apartment 36, Poulsbo, Washington 98370**, those

27  searches were aimed primarily at gathering evidence related to the overdoses, including

28

AFFIDAVIT OF SA Steve Meyer - 10

1 the overdose death, and not at gathering evidence related to the broader, ongoing drug

2 trafficking conspiracy in which SUTER, MOANALE, and others are involved.

3 <u>**TACTICS USED BY DRUG TRAFFICKERS**</u>

4       32.     Based upon my training, experience, and participation in this and other

5 investigations involving narcotics trafficking, my conversations with other experienced

6 agents and law enforcement agents with whom I work, and interviews of individuals who

7 have been involved in the trafficking of methamphetamine, heroin and other narcotics, I

8 have learned and know the following:

9       a.     DTOs often use "stash houses" to conceal their illegal activities and

10 contraband.  Such stash houses allow drug traffickers to keep their contraband at a hidden

11 location, where they may not live, thereby making it more difficult for law enforcement

12 and/or competitors to identify these locations where drugs and drug proceeds may be

13 hidden.

14       b.     It is common for drug dealers to possess narcotics, drug

15 paraphernalia, and other items which are associated with the sale and use of controlled

16 substances such as scales, containers, cutting agents and packaging materials in their

17 residences, stash houses, storage units, garages, outbuildings and/or vehicles on their

18 property.

19       c.     It is common for drug dealers to hide proceeds of illegal narcotics

20 sales and records of illegal narcotics transactions in secure locations within their

21 residences, stash houses, storage units, garages, outbuildings and/or vehicles on the

22 property for their ready access and to conceal them from law enforcement authorities.

23       d.     It is common to find papers, letters, billings, documents, and other

24 writings, which show ownership, dominion, and control of businesses, residences, and/or

25 vehicles in the residences, stash houses, storage units, garages, outbuildings and/or

26 vehicles of drug traffickers.  Items of personal property that tend to identify the person(s)

27 in residence, occupancy, control, or ownership of the premises also include canceled

28 mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries,

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 | utility and telephone bills, statements, identification documents, keys, financial papers,

2 | rental receipts and property ownership papers, personal and business telephone and

3 | address books and telephone toll records, and other personal papers or identification

4 | cards in the names of subjects involved in the criminal activity being investigated.

5 |       e.    Drug traffickers frequently amass large proceeds from the illegal

6 | sale of controlled substances that they attempt to legitimize.  To accomplish this goal,

7 | drug traffickers use financial institutions and their attendant services, securities, cashier's

8 | checks, safe deposit boxes, money drafts, real estate, shell operations, and business

9 | fronts.  Persons involved in drug trafficking and/or money laundering keep papers

10 | relating to these activities for future reference, including federal and state tax records,

11 | loan records, mortgages, deeds, titles, certificates of ownership, records regarding

12 | investments and securities, safe deposit box rental records and keys, and photographs.  I

13 | know from my training and experience that often items of value are concealed by persons

14 | involved in large scale drug trafficking inside of safes, lock boxes, and other secure

15 | locations within their residences, outbuildings, and vehicles.

16 |       f.    Drug traffickers very often place assets in names other than their

17 | own to avoid detection of these assets by government agencies, and that even though

18 | these assets are in other individual or business names, the drug dealers actually own and

19 | continue to use these assets and exercise dominion and control over them.

20 |       g.    Drug traffickers often document aspects of their criminal conduct

21 | through photographs or videos of themselves, their associates, their property, and their

22 | product.  Drug traffickers usually maintain these photographs or videos in their

23 | possession.

24 |       h.    Drug traffickers often maintain large amounts of United States

25 | currency in order to maintain and finance their ongoing illegal drug trafficking business.

26 | Often drug traffickers from other countries operating in the United States frequently use

27 | wire remitters and bulk cash transfers to transfer currency to co-conspirators living in

28 | other countries.

AFFIDAVIT OF SA Steve Meyer - 12

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    i.    Drug traffickers commonly have in their possession, on their person,

2    and at their residences and/or in their storage units, firearms and other weapons which are

3    used to protect and secure a drug trafficker's property.

4    j.    Drug traffickers use mobile electronic devices including cellular

5    telephones and other wireless communication devices for the purpose of conducting their

6    illegal trafficking business.  As described below, such equipment often contains evidence

7    of these illegal activities.

8    k.    Drug traffickers commonly maintain addresses, vehicles, or

9    telephone numbers which reflect names, addresses, vehicles, and/or telephone numbers of

10   their suppliers, customers and associates in the trafficking organization and it is common

11   to find drug traffickers keeping records of said associates in cellular telephones and other

12   electronic devices.  Traffickers often maintain cellular telephones for ready access to

13   their clientele and to maintain their ongoing narcotics business.  Traffickers frequently

14   change their cellular telephone numbers to avoid detection by law enforcement, and it is

15   common for traffickers to use more than one cellular telephone at any one time.

16   l.    Drug traffickers use cellular telephones as a tool or instrumentality

17   in committing their criminal activity.  They use them to maintain contact with their

18   suppliers, distributors, and customers.  They prefer cellular telephones because, first, they

19   can be purchased without the location and personal information that land lines require.

20   Second, they can be easily carried to permit the user maximum flexibility in meeting

21   associates, avoiding police surveillance, and traveling to obtain or distribute drugs.

22   Third, they can be passed between members of a drug conspiracy to allow substitution

23   when one member leaves the area temporarily.  Since cellular phone use became

24   widespread, every drug dealer I have interacted with has used one or more cellular

25   telephones for his or her drug business.  I also know that it is common for drug traffickers

26   to retain in their possession phones that they previously used, but have discontinued

27   actively using, for their drug trafficking business.  Based on my training and experience,

28

AFFIDAVIT OF SA Steve Meyer - 13

1  the data maintained in a cellular telephone used by a drug dealer is evidence of a crime or

2  crimes.  This includes the following:

3                 i.      The assigned number to the cellular telephone (known as the

4  mobile directory number or MDN), and the identifying telephone serial number (known

5  as either the Electronic Serial Number (ESN), Mobile Identification Number (MIN),

6  International Mobile Subscriber Identity (IMSI) number, or the International Mobile

7  Equipment Identity (IMEI) number) are important evidence because they reveal the

8  service provider, allow us to obtain subscriber information, and uniquely identify the

9  telephone.  This information can be used to obtain toll records, to identify contacts by this

10  telephone with other cellular telephones used by co-conspirators, to identify other

11  telephones used by the same subscriber or purchased as part of a package, and to confirm

12  if the telephone was contacted by a cooperating source.

13                ii.      The stored list of recent received calls and sent calls is

14  important evidence.  It identifies telephones recently in contact with the telephone user.

15  This is valuable information in a drug investigation because it will identify telephones

16  used by other members of the organization, such as suppliers, distributors and customers,

17  and it confirms the date and time of contacts.  If the user is under surveillance, it

18  identifies what number he called during or around the time of a drug transaction or

19  surveilled meeting.  Even if a contact involves a telephone user not part of the

20  conspiracy, the information is helpful (and thus is evidence) because it leads to friends

21  and associates of the user who can identify the user, help locate the user, and provide

22  information about the user.  Identifying a defendant's law-abiding friends is often just as

23  useful as identifying his drug-trafficking associates.

24                iii.      Stored text messages are important evidence, similar to stored

25  numbers.  Agents can identify both drug associates, and friends of the user who likely

26  have helpful information about the user, his location, and his activities.

27

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1          iv.    Photographs on a cellular telephone are evidence because
2    they help identify the user, either through his /her picture, or through pictures of friends,
3    family, and associates that can identify the user.  Pictures also identify associates likely to
4    be members of the drug trafficking organization.  Some drug traffickers photograph
5    groups of associates, sometimes posing with weapons and showing identifiable gang
6    signs.  Also, digital photos often have embedded "geocode" information within them.
7    Geocode information is typically the longitude and latitude where the photo was taken.
8    Showing where the photo was taken can have evidentiary value.  This location
9    information is helpful because, for example, it can show where coconspirators meet,
10   where they travel, and where assets might be located
11         v.     Stored address records are important evidence because they
12   show the user's close associates and family members, and they contain names and
13   nicknames connected to phone numbers that can be used to identify suspects.
14        33.    Narcotics distributors frequently try to conceal their identities by using
15   fraudulent names and identification cards.  Once identities have been created or stolen
16   from other citizens, drug traffickers use those identifications to falsify records such as
17   DOL records and phone records for the purpose of theft of services and to evade
18   detection by law enforcement.
19        34.    It is a common practice for drug traffickers to maintain records relating to
20   their drug trafficking activities in their residences, stash houses, storage units, garages,
21   outbuildings and/or vehicles.  Because drug traffickers in many instances will "front"
22   (that is, sell on consignment) controlled substances to their clients, or alternatively, will
23   be "fronted" these items from their suppliers, such record keeping is necessary to keep
24   track of amounts paid and owed, and such records will also be maintained close at hand
25   so as to readily ascertain current balances.  These records include "pay and owe" records
26   to show balances due for drugs sold in the past (pay) and for payments expected (owe) as
27   to the trafficker's suppliers and distributors, telephone and address listings of clients and
28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   suppliers, and records of drug proceeds.  These records are commonly kept for an

2   extended period of time.

3        35.    Drug traffickers maintain books, records, receipts, notes, ledgers, airline

4   tickets, money orders, and other papers relating to the transportation and distribution of

5   controlled substances.  These documents whether in physical or electronic form, are

6   maintained where the traffickers have ready access to them.  These documents include

7   travel records, receipts, airline tickets, auto rental agreements, invoices, and other

8   memorandum disclosing acquisition of assets and personal or business expenses.  I also

9   know that such records are frequently maintained in narcotics traffickers' residences,

10   stash houses, storage units, garages, outbuildings and/or vehicles.

11                            **CONCLUSION**

12        36.    Based upon the information which has been uncovered during the course of

13   this investigation, including multiple controlled purchases of cocaine, physical and

14   electronic surveillance, records obtained through use of a pen register/trap and trace, and

15   on the advice, experience, knowledge of other agents and officers involved in this

16   investigation, I believe SUTER has used **19630 Ash Crest Loop NE, Apartment 36,**

17   **Poulsbo, Washington 98370** to facilitate violations of the Controlled Substances Act,

18   specifically drug trafficking and money laundering in the Western District of

19   Washington, and elsewhere, in violation of the Controlled Substances Act, Title 21,

20   United States Code, Sections 841(a)(1), 843(b), and 846, and Title 18, United States

21   //

22   //

23   //

24

25

26

27

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  Code, Sections 1956 and 1957, and that there is probable cause to believe evidence of

2  such, as described more particularly in Attachment B, will be found at **19630 Ash Crest**

3  **Loop NE, Apartment 36, Poulsbo, Washington 98370.**

4

5

6  STEVEN MEYER
   Special Agent
7  Drug Enforcement Administration

8  SUBSCRIBED and SWORN TO before me this 29th the day of August, 2018.

9

10

11  DAVID W. CHRISTEL
   UNITED STATES MAGISTRATE
12  JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF SA Steve Meyer - 17

## ATTACHMENT A
### Location to be searched

This warrant authorizes the government to search the primary residence of Jackson Freeman SUTER at **19630 Ash Crest Loop NE, Apartment 36, Poulsbo, Washington, 98370** for the items further described in Attachment B.

The search is to include all rooms within the residence, and any assigned garages or storage rooms, whether attached or detached, and any vehicles found within such garages or any assigned parking spaces.

**Physical Description:** This apartment is in a single-story dwelling built in 1976. The apartment is approximately 870 square feet in size. The apartment is located in Building 5 which has frame siding that is tan in color with a dark brown door. As you face Building 5 from the backside, you walk down a path with wooden railing to two doors. Apartment 36 is the door to the left. A side photo of Building 5 appears below; the wooden railing that leads to apartment 36 is visible at the left of the photo.




AFFIDAVIT OF SA Steve Meyer - 18

**ATTACHMENT B**
**Items to be seized**

From the location described in Attachment A, as well as from vehicles found within the curtilage of the location described in Attachment A, the government is authorized to search for and seize the following items, which are evidence and/or fruits of the commission of the following crimes: distribution and possession with intent to distribute controlled substances in violation of Title 21, United States Code, Section 841(a)(1), and conspiracy to commit these offenses in violation of Title 21, United States Code, Section 846; use of a communications facility in furtherance of a felony drug offense in violation of Title 21, United States Code, Section 843(b); and laundering of monetary instruments in violation of Title 18, United States Code, Sections 1956 and 1957, Possession of Firearms in Furtherance of a Drug Trafficking Crime, in violation of Title 18, United States Code, Section 924(c), and conspiracy to commit these offenses in violation of Title 18, United States Code, Section 371, including the following:

1.      Any suspected controlled substances, including cocaine, fentanyl, and/or heroin;

2.      Firearms and firearms related items, including magazines, ammunition, holsters, and body armor, or other dangerous weapons;

3.      Cellular telephones and other communications devices including Blackberries, Androids, iPhones, and similar devices, which may be searched only for the following items:

AFFIDAVIT OF SA Steve Meyer - 19

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

i.      Assigned telephone number and identifying serial number (e.g., ESN, MIN, IMSI, IMEI);

ii.     Stored list of recent received, sent, or missed calls;

iii.    Stored contact information;

iv.     Stored photographs of narcotics, currency, guns or other weapons, suspected criminal activity, and/or the user of the phone or co-conspirators; and

v.      Stored text messages that relate to the above-enumerated federal crimes;

4.      Financial profits, proceeds and instrumentalities of trafficking in narcotics and money laundering, including US currency and other items of value;

5.      Paraphernalia for packaging, smuggling, processing, diluting, manufacturing, weighing, and distributing controlled substances, for example: hidden compartments, scales, blenders, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and diluting agents such as inositol, vitamin B12, etc.;

6.      Books, records, receipts, notes, ledgers, and other documents relating to the distribution of controlled substances, money laundering, communications between members of the conspiracy, and evidence of the use of apparently legitimate businesses to disguise profits;

7.      Photographs, video tapes, digital cameras, and similar items depicting friends and relatives of the property occupants, or suspected buyers or sellers of controlled substances, controlled substances, and assets derived from the distribution of controlled substances

8.      Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, and money laundering;

9.      Financial records relating to controlled substances income and expenditures of money and wealth, to wit: money orders, wire transfer records, cashier's checks and

AFFIDAVIT OF SA Steve Meyer - 20

1 | receipts, bank account records, passbooks, tax records, safe deposit box keys and records,

2 | checkbooks, and check registers, as well as precious metals and gems such as gold, silver,

3 | diamonds, etc.;

4 |       10.    Items of personal property that tend to identify the person(s) in residence,

5 | occupancy, control, or ownership of the premises and/or vehicle, including canceled mail,

6 | deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility

7 | and telephone bills, statements, identification documents, and keys;

8 |       11.    Identification documents, including passports, visas, alien registration

9 | cards, any and all travel documents, immigration documents, driver's licenses,

10 | identification cards, and social security cards

11 |       12.    Documents indicating travel in interstate and foreign commerce, to include

12 | airline tickets, notes and travel itineraries; airline schedules; gas receipts, bills; charge

13 | card receipts; hotel, motel, and car rental statements; correspondence with travel agencies

14 | and other travel related businesses; airline, rent a car, and hotel frequent flier or user

15 | cards and statements; passports and visas; telephone bills; photographs of foreign

16 | locations; and papers relating to domestic and international travel; and

17 |       13.    Latent prints and identifying material from items at the residence.

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800